Filed: January 14, 2014

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 12-2543**
1:12-cv-01905-MJG

───────────

FREDERICK E. BOUCHAT,

Plaintiff - Appellant,

v.

BALTIMORE RAVENS LIMITED PARTNERSHIP,

Defendant - Appellee.

------------------------

INTERNATIONAL DOCUMENTARY ASSOCIATION; FILM INDEPENDENT; MOTION PICTURE ASSOCIATION OF AMERICA, INCORPORATED,

Amici Supporting Appellee.

───────────

**No. 12-2548**
1:12-cv-01495-MJG

───────────

FREDERICK E. BOUCHAT,

Plaintiff - Appellant,

v.

NFL ENTERPRISES LLC; NFL NETWORK SERVICES, INC.; NFL PRODUCTIONS LLC, d/b/a NFL Films, a subsidiary of NFL Ventures L.P.,

Defendants - Appellees.

------------------------

INTERNATIONAL DOCUMENTARY ASSOCIATION; FILM INDEPENDENT; MOTION PICTURE ASSOCIATION OF AMERICA, INCORPORATED,

Amici Supporting Appellees.

## O R D E R

The Court amends its opinion filed December 17, 2013, as follows:

On page 9, lines 5-7, the sentence and citation, "We review the district court's legal conclusions de novo and its factual findings for clear error. Sundeman, 142 F.3d at 201." are deleted and replaced with the sentence, "Inasmuch as this appeal is from an order of summary judgment, our standard of review is one of de novo."

For the Court – By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 12-2543**

———————————

FREDERICK E. BOUCHAT,

        Plaintiff - Appellant,

    v.

BALTIMORE RAVENS LIMITED PARTNERSHIP,

        Defendant - Appellee.

--------------------------

INTERNATIONAL DOCUMENTARY ASSOCIATION; FILM INDEPENDENT; MOTION PICTURE ASSOCIATION OF AMERICA, INCORPORATED,

        Amici Supporting Appellee.

———————————

**No. 12-2548**

———————————

FREDERICK E. BOUCHAT,

        Plaintiff - Appellant,

    v.

NFL ENTERPRISES LLC; NFL NETWORK SERVICES, INC.; NFL PRODUCTIONS LLC, d/b/a NFL Films, a subsidiary of NFL Ventures L.P.,

        Defendants - Appellees.

--------------------------

INTERNATIONAL DOCUMENTARY ASSOCIATION; FILM INDEPENDENT; MOTION PICTURE ASSOCIATION OF AMERICA, INCORPORATED,

Amici Supporting Appellees.

---

Appeals from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:12-cv-01905-MJG; 1:12-cv-01495-MJG)

---

Argued: October 31, 2013          Decided: December 17, 2013

---

Before WILKINSON, DUNCAN, and DIAZ, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Duncan and Judge Diaz joined.

---

**ARGUED:** Howard J. Schulman, SCHULMAN & KAUFMAN, LLC, Baltimore, Maryland, for Appellant. Robert Lloyd Raskopf, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Appellees. **ON BRIEF:** Marie J. Ignozzi, SCHULMAN & KAUFMAN, LLC, Baltimore, Maryland, for Appellant. Mark D. Gately, HOGAN LOVELLS US LLP, Baltimore, Maryland; Sanford I. Weisburst, Todd Anten, Rachel E. Epstein, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, for Appellees. Julie A. Ahrens, Timothy Greene, STANFORD LAW SCHOOL CENTER FOR INTERNET & SOCIETY, Stanford, California, for International Documentary Association, Motion Picture Association of America, Inc., and Film Independent, Amici Supporting Appellees.

---

WILKINSON, Circuit Judge:

This case presents the latest chapter in extensive litigation over the Baltimore Ravens "Flying B" logo. Frederick Bouchat challenges the National Football League's use of the logo in three videos featured on its television network and various websites, as well as the Baltimore Ravens' display of images that include the logo as part of exhibits in its stadium "Club Level" seating area. The district court found that the defendants' use of the Flying B logo in both settings was fair and therefore did not infringe Bouchat's copyright. We affirm. Any other result would visit adverse consequences not only upon filmmaking but upon visual depictions of all sorts.

I.

In June 1996, months before the beginning of the Baltimore Ravens' inaugural season, the organization unveiled the Flying B logo as its symbol. The logo featured a gold shield with a purple "B" at its center and purple wings extending from either side. Frederick Bouchat, the plaintiff and appellant here, noticed that the logo bore a strong resemblance to one he had created and provided to the chairman of the Maryland Stadium Authority months earlier, to be passed on to the Ravens franchise. Bouchat also requested compensation, assertedly of a nominal nature, in exchange for the Ravens' use of the logo.

3

Upon recognizing the logo, Bouchat obtained a copyright registration on his drawings but did not contact the Ravens at that time.

In May of 1997, after the Ravens had played their first season, Bouchat filed his first lawsuit against the Ravens and a subsidiary of the National Football League ("NFL"), alleging that the Flying B logo infringed the copyright in three of his drawings. Ultimately, this court refused to set aside a jury's verdict that the defendants were liable as to one of the drawings. See Bouchat v. Baltimore Ravens, Inc., 241 F.3d 350, 353 & n.1, 357 (4th Cir. 2000) ("Bouchat I").

After the 1998 season, the Baltimore Ravens adopted a new logo (the "Raven Profile Logo") and no longer featured the Flying B on their uniforms and merchandise. We have subsequently issued three more decisions in lawsuits brought by Bouchat regarding the Flying B logo. See Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514 (4th Cir. 2003) ("Bouchat II") (affirming a jury award of zero dollars for the original infringement); Bouchat v. Bon-Ton Dep't Stores, Inc., 506 F.3d 315, 328 (4th Cir. 2007) ("Bouchat III") (affirming a number of judgments in favor of NFL licensees that had used the Flying B logo because Bouchat was "precluded from obtaining actual damages against them"); Bouchat v. Baltimore Ravens Ltd. P'ship, 619 F.3d 301 (4th Cir. 2010) ("Bouchat IV") (finding that

4

footage of the Flying B logo in season highlight films and in a short video shown on the large screen during Ravens home games was not fair use, but that the Ravens' display of the logo in images in its corporate lobby was).

Bouchat commenced the suits currently before this court in May and June of 2012. He seeks to, inter alia, enjoin defendants from using the Flying B Logo incidentally in videos and photographs that were not at issue in Bouchat IV. Bouchat has alleged infringement in three videos that appeared on the NFL Network, as well as on the NFL.com or other websites. These videos feature fleeting and infrequent footage of the Flying B logo. He has also challenged the Ravens' use of pictures with the Flying B Logo in historical exhibits in the Club Level area of M&T Bank Stadium.

The district court found, on summary judgment, that the defendants' limited use of the Flying B logo qualified as fair use. For both the videos and the photograph displays, it applied each of the four fair use factors laid out in the copyright statute: (1) "the purpose and character of the use"; (2) "the nature of the copyrighted work"; (3) "the amount and substantiality of the portion used"; and (4) "the effect of the use upon the potential market for the copyrighted work." 17 U.S.C. § 107. For both the videos and the photos, the district court found that the first factor counseled in favor of fair

5

use. In particular, the district court emphasized that the use of the logo was "transformative," which the Supreme Court has described as a use that "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994). Because of the substantially transformative nature of the uses, the second and third factors did not weigh against fair use. Discussing the fourth factor, the district court found that the use of the logo in the videos and displays was minimally commercial, and that the substantially transformative nature of the use offset any negative effect on the potential market for the Flying B logo.

The court then weighed the four factors together for both the videos and the displays, and determined that the first factor counseled strongly in favor of fair use, while the remaining factors were either neutral or militated only slightly against fair use. Consequently, it found the uses in both settings fair. This appeal followed.

## II.

The power over patent and copyright granted to Congress in Article I, Section 8 of the Constitution "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to

6

the products of their genius after the limited period of exclusive control has expired." Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984). To effectuate this public benefit, § 106 of the Copyright Act grants "a bundle of exclusive rights to the owner of the copyright," including the rights "to publish, copy, and distribute the author's work." Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 546-47 (1985); see also 17 U.S.C. § 106. In order to vindicate the same "constitutional policy of promoting the progress of science and the useful arts" that underlies the Patent and Copyright Clause, courts developed the doctrine of fair use, which fosters new creation and innovation by limiting the ability of writers and authors to control the use of their works. Harper & Row, 471 U.S. at 549 (internal quotation marks omitted).

The Copyright Act of 1976 codified the fair use doctrine for the first time, creating § 107 as a statutory exception to the typical protections provided to copyright holders in § 106. Bouchat IV, 619 F.3d at 307 (citing Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 576 (1994)). "Congress meant § 107 to restate the present judicial doctrine of fair use, not to change, narrow, or enlarge it in any way and intended that courts continue the common-law tradition of fair use adjudication." Campbell, 510 U.S. at 577 (internal quotation

7

marks omitted). As a result, the fair use doctrine continues to serve as "an equitable rule of reason, for which no generally applicable definition is possible." Sundeman v. Seajay Soc'y, Inc., 142 F.3d 194, 202 (4th Cir. 1998) (internal quotation marks omitted).

Nonetheless, Congress did provide a list of four factors that "guide the determination of whether a particular use is a fair use." Bouchat IV, 619 F.3d at 308 (internal quotation marks omitted). Those factors are:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These factors cannot be treated in isolation from one another, but instead must be "weighed together, in light of the purposes of copyright." Campbell, 510 U.S. at 578. This balancing necessitates a "case-by-case analysis" in any fair use inquiry. Id. at 577. Our precedents have placed primary focus on the first factor. See Bouchat IV, 619 F.3d at 308-11, 313-14; Bond v. Blum, 317 F.3d 385, 394-95 (4th Cir. 2003); Sundeman, 142 F.3d at 202-04. A finding of fair use is a

8

complete defense to an infringement claim: "the fair use of a copyrighted work . . . is not an infringement of copyright." 17 U.S.C. § 107.

A fair use defense "presents a mixed question of law and fact." Bouchat IV, 619 F.3d 307. Inasmuch as this appeal is from an order of summary judgment, our standard of review is one of de novo.

III.

Bouchat first challenges the NFL's fleeting uses of the Flying B logo in three videos featured on the NFL Network and various websites. Bouchat claims that these uses, described below, are not fair use and consequently infringe his copyright. For the reasons that follow, we hold that the NFL's incidental displays of the Flying B logo in the videos are indeed fair use.

A.

The three videos Bouchat challenges were produced by the NFL for display on the NFL network, and were also featured on websites including NFL.com and Hulu.com. Two of the videos were part of the film series Top Ten, each episode of which features a countdown of ten memorable players, coaches, or events in NFL history. The third video is part of the Sound FX series, which provides viewers with an inside look at the sights and sounds of the NFL through players who wear microphones. Consistent with

9

our responsibility to examine each use on a "case-by-case" basis, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994), we examine the various videos in detail in order to determine the nature of the use of the Flying B logo in each.

Top Ten: Draft Classes recounts and analyzes in short segments the ten best NFL draft classes of all time. It begins by explaining that the purpose of the video is to declare which draft classes are most impressive. The video features a four-minute segment on the Baltimore Ravens' 1996 draft class, rated number six by the show. It contains interviews with players, journalists, and Ravens front office personnel regarding the team's move to Baltimore and the quality of the 1996 draft class. It also shows historical footage from the day of the draft. These interviews and voiceovers make up the vast majority of the video. In two spots, however, the Flying B logo is visible for less than one second: once on a banner and a helmet at the opening of the segment, and again on the side of a helmet during game footage toward the end of the segment. The four minute video uses its interviews and historical footage, including the exceptionally brief appearances of the Flying B logo, to tell the story of the Ravens 1996 draft class and its impact on the new organization.

The second video, Top Ten: Draft Busts, also begins with narration that explains that the episode will showcase the least

10

successful draft picks. It then features short segments on each unsuccessful pick or set of picks, including the number eight "bust" Lawrence Phillips, who was selected by the St. Louis Rams in 1996. The video features discussion of Phillips's college career, interviews with those present at the time, news reports detailing his trouble with the law, and footage from practices and games. The segment recounts Phillips's promise as a football player and the problems that prevented him from fulfilling it. At the end of the segment, a defensive player tackles Phillips, and it is possible to catch a glimpse of the Flying B logo on the player's helmet if one chances to look at it for the fraction of a second it is visible.

The final video, Sound FX: Ray Lewis, features a collection of footage and audio of Ray Lewis throughout his career. The 24-minute video is split into eight sections, each of which tells the story of a different aspect of Lewis's career though video footage and recorded statements by Lewis and those around him. One of the segments focuses on Ray Lewis at training camp and lasts for roughly two minutes. During an eight-second period of the training camp segment, the Flying B logo is visible on some of the Ravens players' helmets. And twice in other segments of the show, as Lewis makes a tackle, the Flying B logo is partially visible for less than one second. Otherwise, the Raven

Profile logo is the only logo visible throughout <u>Sound FX: Ray Lewis</u>.

Bouchat argues that the use of the Flying B logo in these three videos does not qualify as fair use. First, Bouchat argues that this court's decision in <u>Bouchat IV</u> bars the NFL's fair use claim because the highlight videos at issue in that case are "materially indistinguishable" from the videos in this case. Appellant's Br. at 29. He further contends that an independent assessment of the fair use factors requires a finding of infringement. Focusing largely on the first fair use factor -- the purpose and character of the use -- Bouchat contends that the use of the Flying B logo was not transformative. It is, he claims, being used in the same way in these videos as it was in the infringing videos in <u>Bouchat IV</u>: to identify Ravens players. And even if the use were transformative, the district court erred by not weighing the transformation against the commerciality of the use under the first factor, as well as against the remaining § 107 factors. Finally, Bouchat disputes the district court's finding that the defendants acted in good faith, arguing that they were serial infringers whose bad faith was all too evident.

B.

The first fair use factor focuses on "the purpose and character of the use, including whether such use is of a

12

commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). The preamble to § 107 lists examples of uses that are fair: "criticism, comment, news reporting, teaching . . . scholarship, or research." Id. § 107. These examples serve as a "guide[]" for analysis under the first factor. Campbell, 510 U.S. at 578. The essential inquiry under the first factor can be separated into two parts: whether the new work is transformative, see id. at 579, and the extent to which the use serves a commercial purpose. See Bouchat IV, 619 F.3d at 310-11. We discuss each in turn.

1.

"A 'transformative' use is one that 'employ[s] the quoted matter in a different manner or for a different purpose from the original,' thus transforming it." A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 638 (4th Cir. 2009) (quoting Pierre N. Leval, Commentary, Toward a Fair Use Standard, 103 Harv. L. Rev. 1105, 1111 (1990)). Transformative works rarely violate copyright protections because "the goal of copyright, to promote science and the arts, is generally furthered by the creation of transformative works. Such works thus lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright." Campbell, 510 U.S. at 579. Importantly, a transformative use is one that "adds something

new" to the original purpose of the copyrighted work. Id.; Bouchat IV, 619 F.3d at 314.

Each of the videos in this case is intended to present a narrative about some aspect of Ravens or NFL history. Top Ten: Draft Classes recounts the Ravens' 1996 draft, documenting football's return to Baltimore, the team's strategy for the 1996 draft, and the impressive result of its efforts. During the four-minute segment's interviews, archival footage, and voiceover, the Flying B logo is visible two different times, for less than one second each time. Top Ten: Draft Busts recounts the disappointing path of Lawrence Phillips's once promising career, complete with interviews, game tape, and news footage. Toward the end of the four-minute segment, the Flying B logo is partially visible on the helmet of a Raven tackling Phillips for a fraction of a second. Finally, Sound FX: Ray Lewis provides an inside look at the career of Ray Lewis through the sights and sounds that accompanied his play. The Flying B is visible for a longer stretch during this video, though the Raven Profile logo, which has identified the Ravens since the 1999 season, is, comparatively, featured much more prominently.

The use of the Flying B logo in each of these videos differs from its original purpose. Bouchat IV, 619 F.3d at 314. See also Campbell, 510 U.S. at 579. It initially served as the brand symbol for the team, its on-field identifier, and the

14

principal thrust of its promotional efforts. None of the videos use the logo to serve the same purpose it once did. Instead, like the historical displays featuring the Flying B logo in the lobby of the Ravens' headquarters in Bouchat IV, these videos used the Flying B as part of the historical record to tell stories of past drafts, major events in Ravens history, and player careers. Bouchat IV, 619 F.3d at 314; see also Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 609-10 (2d. Cir. 2006) (finding that Grateful Dead posters reproduced in a biographical text served as "historical artifacts" that helped readers to understand the text). The logo, then, is being used "not for its expressive content, but rather for its . . . factual content," Bouchat IV, 619 F.3d at 314 (quoting Bond v. Blum, 317 F.3d 385, 396 (4th Cir. 2003)), and in such a manner that no doubt "adds something new." Id. And contrary to Bouchat's claims, it does not matter that the Flying B logo is unchanged in the videos, for "[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature." Vanderhye, 562 F.3d at 639.

This finding of transformative use is reinforced by the exceptionally insubstantial presence of the Flying B logo in these videos. In the vast majority of its appearances, it is present for fractions of a second, and can be perceived only by someone who is looking for it. "The extent to which unlicensed

15

material is used in the challenged work can be a factor in determining whether a . . . use of original materials has been sufficiently transformative to constitute fair use." Bill Graham Archives, 448 F.3d at 611. The Flying B logo cannot be said to serve its original function of identifying the Ravens players and organization if it is all but imperceptible to those viewing the videos. It serves no expressive function at all, but instead acts simply as a historical guidepost -- to those who even detect it -- within videos that construct new narratives about the history of the Ravens and the NFL. See Bond, 317 F.3d at 396; Elvis Presley Enters., Inc. v. Passport Video, 349 F.3d 622, 629 (9th Cir. 2003) (noting the transformative nature of using copyrighted works as historical context), overruled on other grounds by Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 995 (9th Cir. 2011) (per curiam).

The sole video that features the Flying B for long enough that it could serve as an identifier is Sound FX: Ray Lewis. The episode runs for nearly 24 minutes, and features just one stretch of less than ten seconds in which the Flying B logo is visible more than fleetingly. The 24-minute video is replete with countless images of the Raven Profile logo, both in game and practice footage, which currently serves to identify the Ravens and adorns their merchandise. It is the Raven Profile logo, and not the Flying B, that now serves an expressive

16

function. See Bill Graham Archives, 448 F.3d at 611 (posters reproduced in a biographical work were "inadequate to offer more than a glimpse of their expressive value"). The Flying B logo, used only incidentally, no longer serves "the same intrinsic purpose as the original," Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 923 (2d Cir. 1994). Its use therefore qualifies as transformative.

Bouchat argues that the uses of the Flying B logo in the videos in this case are indistinguishable from those adjudicated in Bouchat IV. Appellant's Br. at 28-31. Both, he says, act to identify the team. In reality, however, the uses are strikingly different. In the season highlight films from Bouchat IV, the logo was shown again and again, always as a brand identifier for the Ravens organization and its players. Bouchat IV, 619 F.3d at 306-07. As we found, the logo simply replicated its original function when footage of the seasons was shot, condensed, and reproduced in a summary film. Id. at 309. But the current use, as noted above, differs in two important respects from the Bouchat IV videos. We found in that case that the season highlight videos did not change the way in which viewers experienced the logo, making the use non-transformative. Id. Here, however, because the videos used the historical footage to tell new stories and not simply rehash the seasons, it used the Flying B logo for its "factual content" and was transformative.

17

See id. at 314. Equally important is the fact that, while the logo was featured substantially, again and again, in the season highlight films, it was used only fleetingly and insignificantly here. Its function as an identifier was significantly diminished, limiting its expressive value.

This court's two hypotheticals in Bouchat IV provide a particularly useful contrast between the videos in that case and those presently before the court. In finding that the season highlight videos were not fair use, we laid out two different viewer experiences:

> In the first, an individual at home in her living room in 1996 watches a Ravens football game on television. The Flying B logo on the helmets of one team helps her identify the team as the Ravens. In the second, an individual at home today (2010) in his living room watches the 1996 Ravens season highlight film. The Flying B logo on the helmets of one team helps him identify the team as the Ravens. The logo plays the same role in each example. Its purpose is not transformed in the highlight film, viewed some fourteen years later.

Id. at 309. In the season highlight videos, the Flying B still served the purpose of identifying the team as the Ravens as they play opponents -- its core and crucial function. But in the Top Ten and Sound FX videos, where it is rarely visible for more than a second, it cannot possibly serve as a meaningful identifier of the franchise. Instead, like the Flying B in the corporate lobby, it is used for its factual content to tell new historical narratives about the players and franchise. See id.

18

at 314. The use of the Flying B logo is thus substantially transformative.

2.

The first factor also requires an inquiry into the commercial nature of the use at issue. While a commercial purpose "may weigh against a finding of fair use," Campbell, 510 U.S. at 579, the Supreme Court has warned us not to over-emphasize its impact: "If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities are generally conducted for profit in this country." Id. at 584 (internal quotation marks omitted). Vast numbers of fair uses occur in the course of commercial ventures. An overbroad reading of the commercial sub-prong would thus eviscerate the concept of fair use. See Vanderhye, 562 F.3d at 639. Instead, the commerciality inquiry is most significant when the allegedly infringing use acts as a direct substitute for the copyrighted work. Campbell, 510 U.S. at 591. Meanwhile, "the more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Vanderhye, 562 F.3d at 639

(quoting Campbell, 510 U.S. at 579) (internal quotation marks omitted).

In this case, there is no doubt, as the district court found, that the NFL has produced and distributed these videos for commercial gain. But as the district court also noted, the "substantially transformative" nature of the use renders its commercial nature largely insignificant. J.A. 200. Indeed, in Bouchat IV, when evaluating the commerciality of the season highlight films, we noted that because we had found the use of the logo "non-transformative, we have no hesitation in concluding that the commercial nature of the use weighs against a finding of fair use." 619 F.3d at 311. Here, however, where we have found the use of the Flying B logo to be substantially transformative, the NFL's profit-seeking weighs much less strongly against a finding of fair use.

Finally, the limited nature of the uses counsels against placing significant weight on their commercial nature. The key inquiry is the extent to which the Flying B logo itself -- and not the videos as a whole -- provides commercial gain to the NFL. "[T]he degree to which the new user exploits the copyright for commercial gain -- as opposed to incidental use as part of a commercial enterprise -- affects the weight" due to the commercial character of a particular use. Elvis Presley Enters., Inc., 349 F.3d at 627. The uses of the Flying B logo in these

20

three videos can only properly be described as incidental to the larger commercial enterprise of creating historical videos for profit. Although the logo was part of a product created for commercial gain, its role in facilitating that gain was unquestionably minimal.

3.

Bouchat has also urged this court to make a finding of bad faith on the part of the NFL and the Ravens, largely due to past findings of infringement by both entities. Appellant's Br. at 40-41, 50. As an initial matter, "good faith" is not listed as a fair use factor in § 107 of the Copyright Act and it is questionable whether allegations of subjective "bad faith" could undercut a use that objectively was fair. See Campbell, 510 U.S. at 585 n.18. Even assuming that they could, however, the district court refused to find that the NFL and the Ravens acted in bad faith here, noting: "there is nothing to put into doubt the NFL's good faith in believing that the uses of the Flying B Logo in Documentaries were non-infringing fair uses." J.A. 201. See also J.A. 195 (making the same finding with regard to the Ravens). Bouchat directs us to previous examples of infringement by the Ravens and the NFL, and asks that we infer bad faith. Absent any evidence to support this conclusion, we decline to disturb the ruling of the district court. The transformative nature of the defendants' uses of the Flying B logo provided

21

them with every reason to believe that their use was fair. In Bouchat IV, we addressed the past actions of the defendants, and noted that they were relevant in part because "the purpose of the use [was] not transformed." 619 F.3d at 311. Here, because the use is transformative, any past infringement is simply inapposite.

C.

The fleeting and transformative use of the Flying B logo in the videos means that the first factor in § 107 counsels strongly in favor of fair use. The remaining criteria do nothing to undermine this conclusion. The second factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). The logo is a creative work, and therefore "closer to the core of works protected by the Copyright Act." Bouchat IV, 619 F.3d at 311 (internal quotation marks omitted). Nonetheless, "if the disputed use of the copyrighted work is not related to its mode of expression but rather to its historical facts, then the creative nature of the work" matters much less than it otherwise would. Vanderhye, 562 F.3d at 640 (internal quotation marks omitted). Indeed, as we noted in Bouchat IV, "the second factor may be of limited usefulness where the creative work of art is being used for a transformative purpose." 619 F.3d at 315 (quoting Bill Graham Archives, 448 F.3d at 612) (internal quotation marks omitted). Thus, while Bouchat's original drawing

22

is a creative work, the NFL's transformative use lessens the importance of the Flying B logo's creativity. Consequently, this factor is largely neutral.

The third factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). The Flying B is reproduced in full in at least some of its appearances in the videos, which "militat[es] against a finding of fair use," but "does not preclude" it. Bouchat IV, 619 F.3d at 315 (quoting Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 449-50 (1984); Sundeman v. Seajay Soc'y, Inc., 142 F.3d 194, 205 (4th Cir. 1998)) (internal quotation marks omitted). Ultimately, "the extent of permissible copying varies with the purpose and character of the use." Sundeman, 142 F.3d at 205-06 (quoting Campbell, 510 U.S. at 586-87) (internal quotation marks omitted). Here, the NFL had no choice but to film the whole logo in order to fulfill its "legitimate transformative purpose" of creating the historical videos at issue. Bouchat IV, 619 F.3d at 315. Though the NFL has used Bouchat's work in its entirety, the transformativeness of the use and the character of Bouchat's work lead us to give very little weight to this factor. It would be senseless to permit the NFL to use the Flying B logo for factual, historical purposes, but permit it to show only a half, or two-thirds of it.

23

The fourth factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). We are required to "determine whether the defendants' [use of the logo] would materially impair the marketability of the work and whether it would act as a market substitute for it." Bond, 317 F.3d at 396. A transformative use renders market substitution less likely and market harm more difficult to infer. Campbell, 510 U.S. at 591. The transient and fleeting use of the Flying B logo, as well as its use for its factual, and not its expressive, content, leads us to conclude that it serves a different purpose in the videos than it does standing alone. As a result, the new, transformative use is unlikely to supplant any market for the original. See Sundeman, 142 F.3d at 207.

### D.

The four § 107 factors indicate that the NFL's fleeting and insubstantial use of the Flying B logo in these videos qualifies as fair use. The first factor, rightfully the principal focus of the parties' discussion, counsels strongly in favor of fair use. The remaining fair use factors are largely neutral, providing compelling arguments neither for nor against fair use. Consequently, in the aggregate, the four factors point in favor of a fair use finding.

24

Our analysis under § 107 is confirmed by the Supreme Court's explication of the underlying interests that inform copyright law and its relationship to the First Amendment. While copyright law rewards the owner, "[t]he sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors." Sony Corp., 464 U.S. at 429 (internal quotation marks omitted). As a result, Congress has attempted over the years to balance the importance of encouraging authors and inventors by granting them control over their work with "society's competing interest in the free flow of ideas, information and commerce." Id. at 429. Absent any protection for fair use, subsequent writers and artists would be unable to build and expand upon original works, frustrating the very aims of copyright policy. Campbell, 510 U.S. at 575-76. For creation itself is a cumulative process; those who come after will inevitably make some modest use of the good labors of those who came before. See Br. for Int'l Documentary Ass'n, Motion Picture Ass'n of Am., Inc. & Film Indep. as Amici Curiae ("IDA Brief") at 9. After all, "it should not be forgotten that the Framers intended copyright itself to be the engine of free expression." Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 558 (1985).

Fair use, then, is crucial to the exchange of opinions and ideas. It protects filmmakers and documentarians from the inevitable chilling effects of allowing an artist too much control over the dissemination of his or her work for historical purposes. Copyright law has the potential to constrict speech, and fair use serves as a necessary "First Amendment safeguard[]" against this danger. Eldred v. Ashcroft, 537 U.S. 186, 219 (2003). The case-by-case nature of the inquiry offers the advantage of flexibility, but it also lacks predictability and clarity, which is often an impediment to free expression. As a result, fair use must give speakers some reasonable leeway at the margins. As the Supreme Court has noted, the "considerable latitude for scholarship and comment" secured by the fair use doctrine protects the core value of free expression from excessive litigation and undue restriction. Id. at 220 (internal quotation marks omitted); see also id. at 219.

Top Ten: Draft Classes, Top Ten: Draft Busts, and Sound FX: Ray Lewis share the qualities of other historical documentaries. They feature three key components: archival footage, commentary, and interviews. These ingredients are crucial to the creation of any historically accurate film. They also align the videos with the examples in § 107's preamble: "criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107. Were we to require those wishing to produce films and

26

documentaries to receive permission from copyright holders for fleeting factual uses of their works, we would allow those copyright holders to exert enormous influence over new depictions of historical subjects and events. Such a rule would encourage bargaining over the depiction of history by granting copyright holders substantial leverage over select historical facts. It would force those wishing to create videos and documentaries to receive approval and endorsement from their subjects, who could "simply choose to prohibit unflattering or disfavored depictions." See IDA Brief at 5. Social commentary as well as historical narrative could be affected if, for example, companies facing unwelcome inquiries could ban all depiction of their logos. This would align incentives in exactly the wrong manner, diminishing accuracy and increasing transaction costs, all the while discouraging the creation of new expressive works. This regime, the logical outgrowth of Bouchat's fair use position, would chill the very artistic creation that copyright law attempts to nurture. See Sony Corp., 464 U.S. at 429.

The NFL wishes to create narratives about various aspects of its history, including some that transpired between 1996 and 1998, when the Flying B logo represented the Ravens. These videos have told new stories and feature all of the hallmarks of documentary films. They also, of course, contain fleeting, insubstantial images of the Flying B logo. But just as it would

27

have been a terrible shame to prevent Edward Hopper from painting the "Esso" sign in his masterful Portrait of Orleans, so too would it be a mistake to prevent the NFL from using the Flying B logo to create new protected works. See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc., 547 F.3d 1095, 1100 (9th Cir. 2008) (noting that under trademark law, the First Amendment protects those uses that have artistic relevance). The NFL may not arouse sympathies in the way that a revered artist does, but the consequences of this case reach far beyond its facts. Society's interest in ensuring the creation of transformative works incidentally utilizing copyrighted material is legitimate no matter who the defendant may be.

IV.

Bouchat next challenges the incidental use of the Flying B logo in certain historical displays located on the "Club Level" of the Baltimore Ravens' stadium. The facts of this particular claim are detailed below. For the reasons that follow, we conclude that this particular instance of display also qualifies as a fair use.

A.

The club section of the Ravens' stadium occupies the 200-level concourse. The Club Level provides a host of amenities, including, among other things, spacious seating, carpeted

28

floors, refuge from the elements, attractive décor, specialty concessions, and enhanced customer service. The Club Level accommodates over 8,000 people and is accessible only to those who purchase Club Level tickets. These tickets are priced between $175 and $355 per game.

The three displays challenged by Bouchat -- a timeline, a highlight reel, and a significant plays exhibit -- are all located on the Club Level. Each addresses a discrete subject matter. Considered together, they cover an impressive span of Baltimore football history. The Flying B logo plays an incidental role in only a fraction of the historical depictions featured in the displays. Overall, the exhibits document more than one hundred years of history preceding the advent of the Flying B logo and many significant historical events post-dating it.

The timeline, which begins with the year 1881, covers those individual years that illustrate important events in the Baltimore football story. For instance, the portion of the exhibit devoted to the year 1959, which surrounds the exit from the women's restroom, states in bold letters "TWO IN A ROW" and includes as a caption "Baltimore repeats as NFL Champions in Baltimore – Again Against Giants." Historical photographs, posters, and further descriptive text round out this component

of the exhibit, which is generally representative of other years included in the display.

With respect to Bouchat's challenge, the segment for a single year -- 1996 -- features the heading "TOUCHDOWN BALTIMORE" and the caption "NFL Returns to Baltimore." To illustrate this significant event in Baltimore sports history, the display includes, among other things, blown-up reproductions of the inaugural 1996 game-day program and ticket, each of which necessarily bears the Flying B logo. No other year in the extensive timeline display -- which covers the tail-end of the 19th century, the success of the Baltimore Colts, the tenure of the Canadian Football League's Baltimore Stallions, and the more recent history associated with the Ravens -- includes even an incidental depiction of the logo.

The highlight reel similarly includes illustrations of significant moments in Ravens' history. The reel features a series of largely interconnected depictions, located near concession areas, comprised of photographs accompanied by dates and descriptive text. The Flying B logo appears incidentally in several images. For instance, one exhibit includes a picture of a former Ravens player, supplemented by the date "April 19, 1997" and a textual notation which reads, in part, "The Ravens select Peter Boulware with their 1st pick in the 1997 draft (4th overall)." In the photo, the Flying B logo is partially visible

on the side of Boulware's helmet. As with the timeline, both the highlight reel and the important plays exhibit -- discussed below -- feature many significant historical depictions where the logo does not appear at all.

The important plays exhibit is structurally analogous to the highlight reel: it comprises photographs, dates, and textual descriptions commemorating significant on-field achievements of Ravens players. The photographs are exhibited independently throughout the Club Level. Bouchat challenges only two individual exhibits, including one that portrays a Ravens player returning a punt. The text accompanying the photograph states, in part: "Wide Receiver Jermaine Lewis ties an NFL Single-Game Record with two punt return Touchdowns (89 yards and 66 yards)." Given the angle of the photo, the Flying B logo is only incompletely visible on the side of Lewis' helmet. The second exhibit, featuring a similar layout, depicts a Ravens quarterback celebrating a touchdown; the Flying B logo also appears on his helmet.

B.

The district court rejected Bouchat's challenge to the Club Level displays, finding each display of the Flying B justified under the fair use doctrine. Its analysis rested in significant part on this court's decision in Bouchat IV, 619 F.3d 301, which rejected an infringement challenge to a historical display

31

located in the lobby of the Ravens' corporate headquarters. That display, like the one at issue here, contained incidental reproductions of the Flying B logo.

1.

As noted above, the first fair use factor -- "the purpose and character of the use," 17 U.S.C. § 107(1) -- can be reduced to two sub-inquiries: whether the new use is transformative, and to what degree it serves a commercial purpose. See Bouchat IV, 619 F.3d at 314. Each of these components is discussed below. As will become apparent, much of our analysis regarding the content of the documentaries discussed earlier is also applicable to Bouchat's display challenge.

The parties, in reliance upon Bouchat IV, exert significant effort debating whether the challenged historical displays are installed in a "museum-like setting." 619 F.3d at 314. We need not resolve this specific dispute, however, in order to conclude that the three types of exhibits at issue here are "transformative." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 579 (1994). As noted, "[t]he use of a copyrighted work need not alter or augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without actually adding to the original work." A.V. ex rel. Vanderhye v. iParadigms, LLC, 562 F.3d 630, 639 (4th Cir. 2009).

Each of the three challenged Club Level displays is intended to chronicle a significant aspect of Ravens' history, including important plays, specific player achievements, and general historical events. Collectively, the displays provide a multi-faceted portrait of the evolution of professional football in Baltimore. The Flying B logo is included merely as an incidental component of this broader historical narrative. See SOFA Entm't, Inc. v. Dodger Prods., 709 F.3d 1273, 1278 (9th Cir. 2013). Its current function as a historical artifact differs significantly from its original function as the team's logo, whereby it represented the Ravens brand, differentiated Ravens players from members of opposing teams, and generally served as the focal point of promotional efforts.

The logo as it is used in the Club Level displays no longer serves these original purposes. Instead, its presence in the various exhibits -- like in the documentaries -- is purely descriptive and designed merely to preserve a specific aspect of Ravens history. See Bouchat IV, 619 F.3d at 314; Elvis Presley Enters., Inc. v. Passport Video, 349 F.3d 622, 629 (9th Cir. 2003) (noting, in the context of an Elvis documentary, that defendant's "use of many of the television clips is transformative because they are cited as historical reference points"), overruled on other grounds as stated in Flexible Lifeline Sys., Inc. v. Precision Lift, Inc., 654 F.3d 989, 995

33

(9th Cir. 2011) (per curiam). It is the Raven Profile logo -- not the Flying B logo -- that now serves the purpose served by the Flying B logo from 1996 to 1998.

Furthermore, the Flying B logo represents merely a negligible element of the overall exhibition. For instance, the historical timeline chronicles over 100 years of football in Baltimore, but the Flying B logo was used for only three. The Flying B logo is simply absent from large swaths of Baltimore football, and indeed Ravens, history. The logo played no part, for instance, in the decades the Baltimore Colts (and Hall-of-Famer Johnny Unitas) played in the city. And the Ravens' Super Bowl championships were won after the team abandoned the Flying B.

The insignificance of the Flying B logo as a feature of the displays is relevant because "[t]he extent to which unlicensed material is used in the challenged work can be a factor in determining whether a [defendant's] use of original materials has been sufficiently transformative to constitute fair use." Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 611 (2d Cir. 2006); Campbell, 510 U.S. at 587. The logo's comparative insignificance as an element of the three displays thus confirms their transformative quality, and militates in favor of a finding of fair use.

34

2.

The first factor inquiry also involves determining whether the allegedly fair use is commercial in nature. This determination does not, however, require "a clear-cut choice between two polar characterizations, 'commercial' and 'non-profit.'" Maxtone-Graham v. Burtchaell, 803 F.2d 1253, 1262 (2d Cir. 1986). Instead, "[t]he commercial nature of a use is a matter of degree, not an absolute." Id. As noted above, it is important not to over-emphasize this aspect of the inquiry when the use is transformative. Campbell, 510 U.S. at 579.

The Bouchat IV court relied heavily on the fact that the lobby housing the allegedly infringing images was open to the general public free of charge. 619 F.3d at 314. Clearly, in that case, the displays had at most an attenuated commercial purpose: the lobby's décor was not intended to induce a particular purchase or to effectuate a commercial transaction, but rather to stimulate general community support for the team. While the patrons of the Club Level and the members of the public present in the lobby of team headquarters are obviously not equivalent, we do not believe the difference is dispositive. The Club Level displays, like those in the lobby, produce what is essentially an atmospheric effect. They are a negligible, fringe benefit of club membership. The gourmet food, shelter from the elements, and view of the game -- not some miniscule aspect of the wall

35

decor -- provide the primary motivators for purchasing a Club Level ticket. See J.A. 194 (district court fact-finding) ("[T]he static picture displays are not any meaningful part of the incentive for a patron to buy a game ticket.").

The commercial character of defendant's use becomes even more attenuated when one considers that the logo itself -- not the exhibits in general -- technically represents the proper focus of analysis. No one is putting down hundreds of dollars to see the Flying B logo. The Ravens are "not gaining direct or immediate commercial advantage from" any logo display at issue here -- "i.e., [the team's] profits, revenues, and overall commercial performance [are] not tied to" the use. Bouchat IV, 619 F.3d at 314 (internal quotation marks omitted). This is manifestly not a case where "the copier directly and exclusively acquires conspicuous financial rewards from its use of the copyrighted material." Am. Geophysical Union, 60 F.3d at 923.

Furthermore, the use of a logo as an incidental element in a historical exhibit is simply not the type of commercial use frowned upon by § 107. If Baltimore's football history is to be accurately depicted, some incidental reproduction of the logo would seem almost unavoidable. The mere use of a logo in a profit-making venture, however, is quite different from its commercial exploitation. Fair use, as its name suggests, is a matter of degree. And "the degree to which the new user exploits

36

the copyright for commercial gain -- as opposed to incidental use as part of a commercial enterprise" -- is what is significant. See Elvis Presley Enters., Inc., 349 F.3d at 627. Here, the displays include incidental depictions of the Flying B logo merely to "enrich the presentation of the cultural history of the [Ravens], not to exploit copyrighted artwork for commercial gain." Bill Graham Archives, 448 F.3d at 611. Consequently, whether viewed from the standpoint of the Club Level displays' transformative character or from the standpoint of whether they serve a commercial purpose, the first factor cuts decidedly in favor of fair use.

3.

The remaining fair use criteria do not alter the implications of the first. The second factor concerns "the nature of the copyrighted work." 17 U.S.C. § 107(2). "The law generally recognizes a greater need to disseminate factual works" than creative ones. Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 563 (1985). Here, the logo is displayed for its historical significance rather than its intrinsic creative worth. Bill Graham Archives, 448 F.3d at 612-13. As in the documentary context, this factor is thus of no assistance to Bouchat.

The third factor centers on "the amount and substantiality of the portion used in relation to the copyrighted work as a

37

whole." 17 U.S.C. § 107(3). If the second user reproduces only the amount necessary to achieve a valid end, this factor will favor neither party. Elvis Presley Enters., Inc., 349 F.3d at 630. Here, "in order to fulfill the legitimate transformative purpose" of depicting important moments in Baltimore football history, defendant had no choice but to include the Flying B logo in its entirety as an incidental component of the challenged exhibits. Bouchat IV, 619 F.3d at 315. It is hard to see frankly how the use of one-third or two-thirds of the logo is even practical or makes any sense. Thus, as in Bouchat IV, we find this factor also of no help to plaintiff.

The fourth factor requires an assessment of "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). As noted above, we must "determine whether the defendants' [use of the logo] would materially impair the marketability of the work and whether it would act as a market substitute for it." Bond v. Blum, 317 F.3d 385, 396 (4th Cir. 2003). When defendant's use is transformative, market substitution (and the resulting market harm to plaintiff) is less likely. Campbell, 510 U.S. at 591. Here, the incidental reproduction of the Flying B logo in the Club Level historical displays serves a different market function than does the logo standing alone. The new use -- which is both transformative and only minimally commercial -- does not

38

supplant or substitute for the original. See Vanderhye, 562 F.3d at 643; J.A. 196. Finally, we reiterate that although the district court made no findings regarding the existence of a licensing market for historical logos, J.A. 196, findings in Bouchat's favor on this point would be insufficient to overcome the substantial weight of the first three factors. Once again, given the absence of market data, we conclude that this factor standing alone is neutral.

The criteria enumerated in § 107, in the aggregate, thus militate in favor of a finding of fair use. This conclusion is reinforced by broader expressive considerations similar to those articulated in our analysis of the challenged documentaries. Fair use, as a crucial "First Amendment safeguard[]," is an important tool in ensuring that an originator's rights are not expanded unjustifiably at the subsequent expense of free expression. Eldred v. Ashcroft, 537 U.S. 186, 220 (2003). Our holding that the displays constitute a fair use of the Flying B logo preserves these fundamental First Amendment interests.

V.

Our rejection of Bouchat's challenge to the incidental uses of the Flying B logo provides no support for a fair use defense where the alleged infringer exploits a protected work for profit based on its intrinsic expressive value. That scenario, however,

39

is simply not presented on the facts before us. The uses here were not only transformative, but also -- take your pick -- fleeting, incidental, de minimis, innocuous. If these uses failed to qualify as fair, a host of perfectly benign and valuable expressive works would be subject to lawsuits. That in turn would discourage the makers of all sorts of historical documentaries and displays, and would deplete society's fund of informative speech. The district court's finding of fair use with respect to the documentary videos and the historical displays on the Club Level was a correct one. Its judgment is in all respects affirmed.

AFFIRMED