**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-1763**

RUSSELL BRAMMER,

Plaintiff - Appellant,

v.

VIOLENT HUES PRODUCTIONS, LLC, Fernando Mico, Owner,

Defendant - Appellee.

-----------------------------------------------

AMERICAN PHOTOGRAPHIC ARTISTS; AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC.; ARTS & ENTERTAINMENT ADVOCACY CLINIC AT GEORGE MASON UNIVERSITY ANTONIN SCALIA LAW SCHOOL; COPYRIGHT ALLIANCE; DIGITAL JUSTICE FOUNDATION; PACA, DIGITAL MEDIA LICENSING ASSOCIATION, INC.; VOLUNTEER LAWYERS FOR THE ARTS, INC.; NEW YORK INTELLECTUAL PROPERTY LAW ASSOCIATION; NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION; GRAPHIC ARTISTS GUILD, INC.,

Amici Supporting Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:17-cv-01009-CMH-IDD)

Argued: March 19, 2019                          Decided: April 26, 2019

Before MOTZ, KING, and THACKER, Circuit Judges.

Reversed and remanded by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Thacker joined.

_____

**ARGUED:** David Christopher Deal, LAW OFFICE OF DAVID C. DEAL PLC, Crozet, Virginia; David Leichtman, LEICHTMAN LAW PLLC, New York, New York, for Appellant. Thomas Patrick Weir, KIRKLAND & ELLIS, LLP, Washington, D.C., for Appellee. **ON BRIEF:** Tatsuya Adachi, LEICHTMAN LAW PLLC, New York, New York, for Appellant. Judson D. Brown, Paul J. Weeks, KIRKLAND & ELLIS, LLP, Washington, D.C., for Appellee. Scott J. Sholder, Nancy E. Wolff, COWAN, DEBAETS, ABRAHAMS & SHEPPARD, LLP, New York, New York, for Amicus PACA, Digital Media Licensing Association, Inc. Jay Cohen, Darren W. Johnson, Stephen B. Popernik, Matthew P. Merlo, Anne E. Simons, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; Kathryn E. Wagner, Amy A. Lehman, VOLUNTEER LAWYERS FOR THE ARTS, INC., New York, New York, for Amicus Volunteer Lawyers for the Arts, Inc. Peter G. Thurlow, New Yok Intellectual Property Law Association, President, POLSINELLI PC, New York, New York; Martin B. Schwimmer, Lauren B. Emerson, Robert M. Isackson, Second Vice President, Amicus Brief Committee Board Liaison, New York Intellectual Property Law Association, LEASON ELLIS LLP, White Plains, New York; Mitchell Stein, SULLIVAN & WORCESTER LLP, New York, New York, for Amicus New York Intellectual Property Law Association. Keith Kupferschmid, Terry Hart, COPYRIGHT ALLIANCE, Washington, D.C.; Jacqueline C. Charlesworth, Michelle Choe, New York, New York, Beth S. Brinkmann, Michael J. Gaffney, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Copyright Alliance. Thomas B. Maddrey, AMERICAN SOCIETY OF MEDIA PHOTOGRAPHERS, INC., Dallas, Texas, for Amici American Society of Media Photographers, Inc. and Graphic Artists Guild, Inc. Mickey H. Osterreicher, General Counsel, Alicia Calzada, Deputy General Counsel, NATIONAL PRESS PHOTOGRAPHERS ASSOCIATION, Athens, Georgia, for Amici American Society of Media Photographers, Inc., National Press Photographers Association, Graphic Artists Guild, Inc., and American Photographic Artists. Antigone Gabriella Peyton, David Christopher Johnson, PROTORAE LAW PLLC, Tysons, Virginia, for Amicus Arts & Entertainment Advocacy Clinic at George Mason University Antonin Scalia Law School. Andrew Grimm, Omaha, Nebraska, Gregory Keenan, DIGITAL JUSTICE FOUNDATION, Floral Park, New York, for Amicus Digital Justice Foundation.

_____

DIANA GRIBBON MOTZ, Circuit Judge:

Russell Brammer, a commercial photographer, brought this copyright infringement action after learning that Violent Hues Productions, LLC, had made an unlicensed use of one of his photographs on its website. The district court granted summary judgement to Violent Hues, ruling that this unauthorized display constituted "fair use" under the Copyright Act, 17 U.S.C. § 107. For the reasons that follow, we reverse and remand for further proceedings consistent with this opinion.

I.

Brammer licenses his work as stock imagery.[1] On November 19, 2011, Brammer shot the photograph "Adams Morgan at Night" ("Photo") from a rooftop in Washington, D.C. The color-saturated Photo depicts a busy street during the evening in the Adams Morgan neighborhood, with the vehicle traffic rendered as red and white light trails. *See* Appendix A. After processing the Photo, Brammer published a digital copy on his own website. Brammer also uploaded the Photo to the image-sharing website Flickr, including the phrase "© All rights reserved" beneath it. Appendix A. In the past, Brammer has sold physical prints of the Photo — for $200 to $300 — and licensed it for online use twice — once for $1,250, and once for $750.

---

[1] Stock images are "photographs that are fungible in terms of their use in contexts such as magazines, websites, or brochures" and are typically licensed for illustrative or aesthetic purposes. Eric E. Johnson, *The Economics and Sociality of Sharing Intellectual Property Rights*, 94 B.U.L. Rev. 1935, 1962 (2014).

In 2016, Fernando Mico, the owner of the Violent Hues film production company, posted the Photo on novafilmfest.com, a website belonging to the company. That website promoted the Northern Virginia International Film and Music Festival, a revenue-generating event. The website contained a page titled "Plan Your Visit," which highlighted various tourism attractions around the Washington metropolitan area. Mico posted a cropped version of Brammer's Photo above the caption "Adams Morgan, DC," without any attribution or other commentary. *See* Appendix B.

Mico believes that he found the Photo "through a Google Images search, which led [him] to the website Flickr." Mico maintains that he did not see any "indication on the Photo itself or the Flickr website that the Photo was copyrighted," and so believed it to be publicly available. After downloading the Photo, Mico cropped out the Photo's negative space "for stylistic reasons" before putting it on novafilmfest.com.

After Brammer discovered this unauthorized use, his counsel sent a letter to Violent Hues requesting compensation for the use. In response, Violent Hues removed the Photo from its website, but did not compensate Brammer.

Brammer then initiated this copyright infringement action against Violent Hues, seeking damages and attorney's fees. In response, Violent Hues asserted an affirmative "fair use" defense under 17 U.S.C. § 107 and moved for summary judgment. The district court granted the motion. Brammer now appeals.

II.

The sole issue before us is whether Violent Hues made fair use of Brammer's Photo. The fair use defense presents a mixed question of law and fact, requiring us to "review the district court's legal conclusions de novo and its findings of fact for clear error." *Bouchat v. Balt. Ravens Ltd. P'ship*, 619 F.3d 301, 307 (4th Cir. 2010) ("*Bouchat IV*").[2] "[W]hen the district court has found facts sufficient to evaluate each of the statutory fair use factors, an appellate court need not remand for further factfinding but may conclude as a matter of law that the challenged use does not qualify as a fair use of the copyrighted work." *Id.* (internal quotation marks and alterations omitted).

The fair use affirmative defense exists to advance copyright's purpose of "promot[ing] the Progress of Science and useful Arts." U.S. Const. art. I, § 8, cl. 8; *see also Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994). The defense does so by allowing "others to build freely upon the ideas and information conveyed by a work." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350 (1991). But fair use "is not designed to protect lazy appropriators. Its goal instead is to facilitate a class of uses that would not be possible if users always had to negotiate with copyright proprietors." *Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 759 (7th Cir. 2014).

---

[2] Violent Hues maintains that Brammer has forfeited portions of his legal arguments by failing to present these nuances to the district court. We disagree. Brammer clearly challenged Violent Hues' statutory fair use defense before the district court, and in "assessing whether an issue was properly raised in the district court, we are obliged on appeal to consider any theory plainly encompassed by the submissions in the underlying litigation." *U.S. Dep't of Labor v. Fire & Safety Investigation Consulting Servs., LLC*, 915 F.3d 277, 286 n.9 (4th Cir. 2019) (internal quotation marks omitted).

The "ultimate test" of fair use is whether the progress of human thought "would be better served by allowing the use than by preventing it." *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013) (internal quotation marks omitted). In applying this test, a court considers:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. A court weighs these factors "together, in light of the purposes of copyright." *Campbell*, 510 U.S. at 578. In ruling for Violent Hues, the district court found all four factors weighed in favor of fair use. We now consider each factor in turn.

A.

The first factor addresses the "purpose and character" of the secondary use. 17 U.S.C. § 107(1). When assessing this factor, "the primary inquiry is whether the use 'communicates something new and different from the original or [otherwise] expands its utility,' that is, whether the use is 'transformative.'" *Fox News Network, LLC v. Tveyes, Inc.*, 883 F.3d 169, 176 (2d Cir. 2018) (alteration in original) (quoting *Authors Guild v. Google, Inc.*, 804 F.3d 202, 214 (2d Cir. 2015) ("*Google Books*")). A court also asks whether the "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). Finally, the "propriety of the defendant's conduct" may be "relevant to the 'character' of the use." *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985) (internal quotation marks omitted).

6

1.

The "central purpose" of the first factor's transformation inquiry is to determine "whether the new work merely 'supersede[s] the objects' of the original creation." *Campbell*, 510 U.S. at 579 (alteration in original) (quoting *Folsom v. Marsh*, 9 F. Cas. 342, 348 (C.C.D. Mass. 1841) (No. 4,901)). To be transformative, a use must do "something more than repackage or republish the original copyrighted work." *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 96 (2d Cir. 2014). "[T]he more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579. But if the copying is done to "avoid the drudgery in working up something fresh, [then] the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish)." *Id.* at 580.

The transformation inquiry is largely objective.[3] Often the "only two pieces of evidence" that are "needed to decide the question of fair use . . . are the original version . . . and the [secondary use] at issue." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). As the Second Circuit has explained, "[w]hat is critical is

---

[3] We reject Violent Hues' suggestion that we focus our analysis on the subjective intent of the parties, as the district court did. That court found it significant that Brammer's stated purpose in "capturing and publishing the [Photo] was promotional and expressive," while Violent Hues' stated purpose "in using the [Photo] was informational: to provide festival attendees with information regarding the local area." But the difference in the parties' subjective intent is not the proper focus of the transformation inquiry, because a mere "difference in purpose is not quite the same thing as transformation." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 108 (2d Cir. 1998). Although a secondary user may "go to great lengths to explain and defend his use as transformative," *Cariou*, 714 F.3d at 707, a simple assertion of a subjectively different purpose, "by itself, does not necessarily create new aesthetics or a new work," *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1176 (9th Cir. 2012).

how the work in question appears to the reasonable observer, not simply what an artist might say about a particular piece or body of work." *Cariou*, 714 F.3d at 707.

We thus examine Brammer's original Photo and Violent Hues' secondary use of the Photo side-by-side. *Compare* Appendix A, *with* Appendix B. This examination shows no apparent transformation. The only obvious change Violent Hues made to the Photo's content was to crop it so as to remove negative space. This change does not alter the original with "new expression, meaning or message." *Campbell*, 510 U.S. at 579. Rather, the cropping appears to be purely functional, giving the Photo the same dimensions as the other images on Violent Hues' website. This copying is of a kind with other non-transformative uses.[4]

Violent Hues nonetheless contends that it transformed the Photo by placing the image in a list of tourist attractions. Of course, even a wholesale reproduction may be transformed when placed in a "new context to serve a different purpose," but the secondary use still must generate a societal benefit by imbuing the original with new function or meaning. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1165 (9th Cir.

---

[4] *See, e.g.*, *Monge*, 688 F.3d at 1176 (magazine's use of celebrity photos with minimal changes not transformative); *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 938–39 (9th Cir. 2002) ("Merely plucking the most visually arresting excerpt from LANS's nine minutes of footage cannot be said to have added anything new."); *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 79 (2d Cir. 1997) (holding use of a poster as decoration — "a central purpose for which it was created" — not transformative); *cf. Cariou*, 714 F.3d at 706, 711 (finding 25 collages transformative as a matter of law because of changes to "composition, presentation, scale, color palette, and media," but remanding as to five uses with "minimal alterations").

2007). By way of illustration, courts have typically found contextual changes sufficiently transformative in two recurring situations: technological uses and documentary uses.

In the first category, copyrighted works provide raw material for new technological functions. These functions are indifferent to the expressive aspects of the copied works. For example, we have held transformative the total reproduction of student essays for a plagiarism detection service because the database served an "entirely different function" that was unrelated to the expressive content of those essays. *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 639 (4th Cir. 2009); *accord Google Books*, 804 F.3d at 216–17 (holding that an online book archive was "highly transformative" because it served the purpose of allowing users to search books for terms of interest); *Perfect 10*, 508 F.3d at 1165 (holding that an online image search index was "highly transformative"). This only makes sense: a contrary ruling would have risked impairing the functionality of these new information-sorting technologies.

In the second category, copyrighted works serve documentary purposes and may be important to the accurate representations of historical events. These representations often have scholarly, biographical, or journalistic value, and are frequently accompanied by commentary on the copyrighted work itself. *See, e.g.*, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006) (concert posters transformed when reproduced in pictorial history of the Grateful Dead); *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000) (modeling photograph transformed when published as part of newspaper coverage of a related controversy). In *Bouchat V*, we considered a use of this type and concluded that a professional football team's logo was

9

transformed through its appearance in a documentary-like television program and in a display case featuring memorabilia from the team's history. *Bouchat v. Balt. Ravens Ltd. P'ship*, 737 F.3d 932, 944–45 (4th Cir. 2013) ("*Bouchat V*"). There, we were particularly concerned that, absent fair use, a copyright holder could "exert enormous influence over new depictions of historical subjects and events" and effectively remove certain historical moments from the public domain. *Id.* at 944.

The copying here does not fall into either of these categories, as Violent Hues used the Photo expressly for its content — that is, to depict Adams Morgan — rather than for data organization or historical preservation. Instead, Violent Hues' sole claim to transformation is that its secondary use of the Photo provided film festival attendees with "information" regarding Adams Morgan. But such a use does not necessarily create a new function or meaning that expands human thought; if this were so, virtually all illustrative uses of photography would qualify as transformative.

Moreover, none of the underlying concerns that animated *iParadigms* or *Bouchat V* are implicated here. Unlike the secondary users in those cases, Violent Hues' ability to accomplish its purpose of communicating information about area tourist attractions would not be hindered if it had to comply with Brammer's copyright. And society would not be left the poorer for it. Tellingly, Violent Hues does not contend that its use provides any distinct sort of "public benefit" that furthers the "development of art, science, and industry." *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 203 (4th Cir. 1998) (quoting *Rosemont Enters., Inc. v. Random House, Inc.*, 366 F.2d 303, 307 (2d Cir. 1966)).

10

Because of the minimal changes to the Photo's content and context, we conclude that Violent Hues' copying was not transformative. This weighs against a finding of fair use.

2.

The first factor also requires a court to ask whether the "use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Bouchat IV*, 619 F.3d at 311 (quoting *Harper & Row*, 471 U.S. at 562). Because "[v]ast numbers of fair uses occur in the course of commercial ventures," the weight of this subfactor is reduced when a use is transformative. *Bouchat V*, 737 F.3d. at 941–42. Accordingly, "the commerciality inquiry is most significant when the allegedly infringing use acts as a direct substitute for the copyrighted work." *Id.* at 941.

Violent Hues' website did not generate direct revenue or run advertising. But Violent Hues is a limited liability company, and it used the Photo on its website to promote a for-profit film festival. On their own, these facts tend to demonstrate commercial use.

In assessing commerciality, a court also asks whether the use was exploitative, in that others usually pay to engage in similar conduct. For example, in *Bouchat IV*, we noted that it was "customary for NFL teams to license their copyrighted logos for use in any number of commercial products," and that the defendant failed to pay that customary

11

price when it used a copyrighted logo in its team highlight reels. 619 F.3d at 311. Because the highlight reels did not transform the logo, we had "no hesitation in concluding that the commercial nature of the use weigh[ed] against a finding of fair use." *Id*.

This case is similar. When a commercial enterprise seeks to illustrate its website, it is customary to buy licenses for use of appropriate stock imagery. *See* Johnson, *supra*, at 1962−72 (describing stock photography market). Brammer sold such licenses for stock use of his photos. Violent Hues never bought one of these licenses, and its stock use of the Photo was not transformative. Given that Violent Hues is a commercial enterprise and a commercial market exists for stock imagery, its failure to pay the customary fee was exploitative and weighs against fair use.

3.

Although the secondary use's non-transformative nature and commercial status weigh against a finding of fair use, Violent Hues nonetheless asserts that the first factor counts in its favor because it acted in good faith.

When considering the character of a secondary use, the Supreme Court has approved weighing bad faith *against* a secondary user. *Harper & Row*, 471 U.S. at 562−63 (rejecting fair use defense where defendant "knowingly exploited a purloined manuscript"). But this approach to *bad* faith does not necessarily lead to the conclusion that a showing of *good* faith weighs in favor of finding a secondary use was fair.

As a basic matter, copyright infringement is a strict liability offense, in which a violation does not require a culpable state of mind. *See CoStar Grp., Inc. v. LoopNet,*

12

*Inc.*, 373 F.3d 544, 549 (4th Cir. 2004). When an alleged infringer raises an affirmative defense, the baseline rule is that "[f]air use presupposes good faith and fair dealing." *Harper & Row*, 471 U.S. at 562 (internal quotation marks omitted).

Because good faith is thus presumed, most appellate courts, when considering a user's mental state, have just asked whether the "*bad faith* subfactor weighs in plaintiffs' favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 479 (2d Cir. 2004) (emphasis added); *see also Campbell*, 510 U.S. at 585 n.18 (casting doubt on the relevance of good faith to the fair use inquiry); *Oracle Am., Inc. v. Google LLC*, 886 F.3d 1179, 1203 (Fed. Cir. 2018) ("[W]hile bad faith may weigh against fair use, a copyist's good faith cannot weigh in favor of fair use."), *petition for cert. filed*, No. 18-956 (U.S. Jan. 24, 2019); *Monge*, 688 F.3d at 1170 ("[T]he innocent intent of the defendant constitutes no defense to liability." (quoting 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.08[B][1] (Matthew Bender rev. ed. 2011))). Only the First Circuit has derived a good-faith rule from the bad-faith proposition presented in *Harper & Row*. *See Núñez*, 235 F.3d at 23 (finding newspaper's print attribution of image to copyright holder as relevant to first fair use factor). We doubt the validity of such an extension.

But "regardless of the weight one might place on the alleged infringer's state of mind," we see no reason to tip the scales in Violent Hues' favor. *Campbell*, 510 U.S. at 585 n.18. Whatever relevance good faith has to the fair use inquiry, Violent Hues has not offered any evidence that it acted in good faith. At best, Violent Hues appears to have acted negligently. Violent Hues' owner, Fernando Mico, stated that he believed the Photo was freely available. But contrary to Violent Hues' suggestion, this does not end

13

the matter. For Mico did not explain why this belief was reasonable given that all contemporary photographs are presumptively under copyright, 17 U.S.C. § 302(a), and given his own acknowledgment that he downloaded the Photo from Flickr, which stated "© All rights reserved" in the Photo caption.

We thus conclude that Violent Hues' claim of good faith does nothing to aid its fair use defense. The district court clearly erred by finding otherwise. Because Violent Hues' reproduction of the Photo was non-transformative and commercial, we must weigh the first factor against a finding of fair use.

B.

The second factor involves the "nature of the copyrighted work" and requires a court to determine the level of protection the Photo merits. 17 U.S.C. § 107(2). In doing so, a court assesses "the 'thickness' or 'thinness' of [the author's] exclusive rights" and asks "whether or not the [work] had been published at the time of [secondary] use." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 87 (2d Cir. 2014). Because "some works are closer to the core of intended copyright protections than others," and so have thicker rights, this factor teaches that "fair use is more difficult to establish" when such works are copied. *Campbell*, 510 U.S. at 586.

We first consider the thickness of Brammer's rights. When determining the thickness of a photograph's copyright, a court weighs the "range of creative choices available in selecting and arranging the photo's elements," examining aspects like "lighting, camera angle, depth of field, and selection of foreground and background elements." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1120–21 (9th Cir. 2018). The

14

ultimate task is to separate the "facts or ideas set forth in a work," which are not protected, from the "author's manner of expressing those facts and ideas," which is protected. *Google Books*, 804 F.3d at 220.

As a basic matter, photographs are "generally viewed as creative, aesthetic expressions of a scene or image" and have long received thick copyright protection. *Monge*, 688 F.3d at 1177. This is so even though photographs capture images of reality. *See id.* ("Simply because a photo documents an event does not turn a pictorial representation into a factual recitation . . . . Photos that we now regard as iconic often document an event — whether the flight of the Wright Brothers' airplane, the sailor's kiss in Times Square on V–J Day, the first landing on the moon, or the fall of the Berlin Wall.").

In taking the photograph at issue here, Brammer made many creative choices. He alleges that he set up at a "private, rooftop location" and "experimented with numerous shutter speed and aperture combinations." The resulting Photo is a stylized image, with vivid colors and a bird's-eye view. Notably, the vehicle traffic appears as streaks of light. The Photo's subject may be a real-world location, but that location does not, in reality, appear as shown. This creativity entitles the Photo to thick copyright protection. Although Brammer could not prevent others from taking night-time photographs of Adams Morgan, he surely can assert his rights in his own expression of that scene.

In evaluating the nature of the copyrighted work, courts also consider, where relevant, its publication status. If "a work is unpublished," that is "a critical element of its 'nature.'" *Harper & Row*, 471 U.S. at 564. Put differently, when a work is

15

unpublished, the "scope of fair use is narrower" because the author has the "right to control the first public appearance of his expression." *Id.* Violent Hues asks us to derive a corollary principle from the *Harper & Row* rule: that the fact that Brammer published the Photo must necessarily weigh in *favor* of fair use. We reject this argument.

The Supreme Court has never suggested that publication status is relevant to *all* invocations of fair use. Indeed, subsequent to *Harper & Row*, the Court considered whether a parody of the song, "Oh, Pretty Woman," was fair, but made no reference to the fact that the song had been published thirty years earlier when assessing its nature. *See Campbell*, 510 U.S. at 571–72, 586. Similarly, we believe the published status of the Photo has no relevance here. We also note that *Harper & Row* involved a literary work, in which the "right of first publication" is particularly significant because such works, unlike photographs or melodies, are often considered only once. *See Harper & Row*, 471 U.S. at 564 (suggesting that "even substantial quotations might qualify as fair use in a review of a published work or a news account of a speech that had been delivered to the public or disseminated to the press"). In short, context matters. Whatever the wisdom of extending the *Harper & Row* rule in the realm of literary works, the considerations differ in the area of photography, as "visual works are created, and sold or licensed, usually for repetitive viewing." *Ringgold*, 126 F.3d at 79.

Because Brammer's Photo merits thick protection and because we find the Photo's published status has no effect here, the second factor also weighs against fair use.

## C.

The third factor addresses the "amount and substantiality of the portion used." 17 U.S.C. § 107(3). The key question is "whether 'no more was taken than necessary'" to accomplish the secondary user's purpose. *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589). "The extent of permissible copying varies with the purpose and character of the use." *Sundeman*, 142 F.3d at 205–06 (internal quotation marks and alteration omitted). Even a substantial taking "can constitute fair use if justified." *TCA Television Corp. v. McCollum*, 839 F.3d 168, 185 (2d Cir. 2016). But "[u]nless the use is transformative, the use of a copyrighted work in its entirety will normally weigh against a finding of fair use." *Bouchat IV*, 619 F.3d at 311.

Here, Violent Hues used roughly half of the Photo. Moreover, Violent Hues merely removed the negative space and kept the most expressive features, which constituted the "heart of the work." *Sundeman*, 142 F.3d at 205. Given that Violent Hues' use was non-transformative, this considerable taking was not justified. *See Google Books*, 804 F.3d at 215 ("A secondary author is not necessarily at liberty to make wholesale takings of the original author's expression merely because of how well the original author's expression would convey the secondary author's different message."). Violent Hues could just as easily have accomplished its goal of depicting Adams Morgan by taking its own photograph or finding an image under free license. The third factor thus weighs against fair use.

17

D.

The fourth and final statutory factor contemplates "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). This factor requires us to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (internal quotation marks and alterations omitted); *accord Bouchat IV*, 619 F.3d at 312 ("[O]ne need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." (quoting *Harper & Row*, 471 U.S. at 568)). A "common sense" presumption of cognizable market harm exists when a commercial use is not transformative but instead "amounts to mere duplication of the entirety of an original." *Campbell*, 510 U.S. at 591.

That presumption applies here. Violent Hues made commercial use of the Photo and duplicated the heart of the work by copying the Photo's most expressive features. Brammer thus need not demonstrate that the licensing market for his Photo would be depressed should Violent Hues' behavior become widespread. Even so, Brammer introduced evidence showing that he has, on two occasions, licensed this specific Photo for online use. In one instance, a real estate company paid Brammer a $1,250 fee to use the Photo as a stock image to represent Adams Morgan on its website — a similar use to that of Violent Hues. If the real estate company had acted as Violent Hues did, Brammer would not have received that fee. Indeed, if Violent Hues' behavior became common and

18

acceptable, the licensing market for Brammer's work specifically, and professional photography more broadly, might well be dampened.

Violent Hues asks that we affirm the district court's conclusion that Brammer did not show market harm because he made two sales of the Photo after Violent Hues' use began. That cannot be correct. If the mere fact of subsequent sales served to defeat a claim of market harm, then commercially successful works could hardly ever satisfy this factor. Like the others, the fourth factor weighs against fair use.

E.

After examining the four factors, we conclude that none weighs in favor of Violent Hues. Considering these factors together, it is clear that the copying here fails the "ultimate test" of fair use: Violent Hues' online display of Brammer's Photo does not serve the interest of copyright law. *Cariou*, 714 F.3d at 705.

"[C]opyright law embodies a recognition that creative intellectual activity is vital to the well-being of society," and fair use exists to "stimulate creativity and authorship" of derivative but new works. Pierre N. Leval, *Toward a Fair Use Standard*, 103 Harv. L. Rev. 1105, 1109 (1990). Violent Hues' "informational" use of the Photo as a stock image does not further this intellectual objective because Violent Hues said nothing new through this use. Instead, allowance of Violent Hues' defense would frustrate copyright's central goal. If the ordinary commercial use of stock photography constituted fair use, professional photographers would have little financial incentive to produce their work.

We reach our conclusion with the recognition that the Internet has made copying as easy as a few clicks of a button and that much of this copying serves copyright's

19

objectives. Many social media platforms like Twitter, Facebook, and Instagram are specifically designed for the participatory "sharing" — or copying — of content. We express no opinion as to whether such sharing constitutes fair use. We note, however, that Violent Hues' use is not of this kind.

Violent Hues did not comment on the Photo, promote the Photo, "remix" the Photo, or otherwise engage with the Photo in a way that might stimulate new insights. *See* H. Brian Holland, *Social Semiotics in the Fair Use Analysis*, 24 Harv. J.L. & Tech. 335, 390–91 (2011). What Violent Hues did was publish a tourism guide for a commercial event and include the Photo to make the end product more visually interesting. Such a use would not constitute fair use when done in print, and it does not constitute fair use on the Internet. Violent Hues' affirmative defense thus fails as a matter of law.

## III.

For the foregoing reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

## APPENDICES

Appendix A



2,459 views   36 favrs   6 comments

Taken on November 19, 2011

© All rights reserved

21

Appendix B



National Harbor, MD



Adams Morgan, DC



Arlington National Cemetery, VA