**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-2021**

---

LARRY G. PHILPOT,

      Plaintiff – Appellant,

v.

INDEPENDENT JOURNAL REVIEW,

      Defendant – Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Anthony John Trenga, Senior District Judge.  (1:20-cv-00590-AJT-TCB)

---

Argued:  October 24, 2023               Decided:  February 6, 2024

---

Before KING, WYNN, and RUSHING, Circuit Judges.

---

Reversed and remanded by published opinion.  Judge Wynn wrote the opinion, in which Judge King and Judge Rushing joined.

---

**ARGUED:**  Stacy Ann Cole, KEATING, MEUTHING & KLEKAMP, PLL, Cincinnati, Ohio, for Appellant.  Manuel Antonio Cordovez, CREATIVITY IP PLLC, Alexandria, Virginia, for Appellee.  **ON BRIEF:**  Kristine M. Maher, BRICKER GRAYDON LLP, Cincinnati, Ohio, for Appellant.

---

WYNN, Circuit Judge:

Photographer Larry Philpot brought a copyright-infringement claim against news website Independent Journal Review ("IJR") after IJR used his photograph of musician Ted Nugent in an online article. IJR moved for summary judgment, raising the affirmative defense that, pursuant to 17 U.S.C. § 107, its use of the photo constituted "fair use" under the Copyright Act. It alternatively argued that Philpot's copyright registration was invalid.

Philpot cross-moved for summary judgment, contending in relevant part that his registration *was* valid and that IJR's use *was not* fair use. Although the district court found a dispute of material fact as to whether the copyright registration was valid, it granted summary judgment to IJR on "fair use" grounds. Philpot appeals the denial of summary judgment to him as to the copyright registration and the grant of summary judgment to IJR as to "fair use."

We conclude that IJR's use of the photo was not "fair use." And we conclude that Philpot is entitled to summary judgment on the validity of the copyright registration. Therefore, we reverse and remand for further proceedings consistent with this opinion.

I.

The facts, which are undisputed except as noted, are as follows. Philpot is a professional concert photographer who took a photograph of Nugent performing in July 2013 (the "Photo"). On August 15, 2013, pursuant to the copyright-registration procedure outlined in 17 U.S.C. § 408, Philpot submitted the Photo for registration with the United States Copyright Office as part of a collection of unpublished works. The Copyright Office issued Philpot a registration certificate on August 21, 2013. The next month, Philpot also

published the Photo on Wikimedia Commons[1] under a Creative Commons license.[2] The license specified that anyone could use the Photo for free so long as they provided the following attribution: "Photo Credit: Larry Philpot of www.soundstagephotography.com." J.A. 30–31.[3]

Additionally, on August 8, 2013, Philpot entered into a photograph licensing agreement with nonparty AXS TV ("the Agreement"), under which Philpot granted AXS TV a two-year license to inspect at least 1,000 of Philpot's photos in order to select twelve to curate for licensing. The Agreement provided that AXS TV's license to the 1,000 photos would become effective upon Philpot's email delivery of the 1,000 photos to AXS TV. On September 10, 2023, Philpot emailed AXS TV a batch of photos that included the Nugent Photo.

The Agreement provided that AXS TV would pay Philpot a photo licensing fee of $4,500. Philpot also testified in his deposition that his standard photo licensing fee is

---

[1] Wikimedia Commons is a freely licensed media file repository. Any individual can upload a media file—images, sounds, or videos—to the Wikimedia repository for free. Each uploaded media file has its own webpage, akin to its own Wikipedia page. The page contains a notice that any user can then use the media file for free, if they follow the licensing requirements listed on its page.

[2] As the district court described it, a Creative Commons license is "a simple, standardized copyright license that anyone can use to license their work. The copyright holder designates their work as governed by a Creative Commons license, and anyone may use the work provided they adhere to the terms of the license." *Philpot v. Indep. J. Rev.*, No. 1:20-cv-00590-AJT-TCB, 2021 WL 3669321, at *2 (E.D. Va. Aug. 18, 2021).

[3] Citations to the "J.A." and "S.J.A." refer, respectively, to the Joint Appendix and Sealed Joint Appendix filed by the parties in this appeal.

$3,500. However, in at least one instance, he permitted a magazine to use a photo for free when it was unwilling to pay his "standard fee," under the condition that it included his desired attribution.

In 2016, IJR posted an article titled "15 Signs Your Daddy Was a Conservative." J.A. 289. Under Sign 5, "*He hearts 'The Nuge'*"—referring to Ted Nugent—the article featured the Photo. J.A. 38. The article did not include the required attribution. Instead, the article contained only a hyperlink to Nugent's Wikipedia page. Through that link, users could then access the "Wiki Commons site where the Photograph was hosted with all the required attribution information." *Philpot v. Indep. J. Rev.*, No. 1:20-cv-00590-AJT-TCB, 2021 WL 3669321, at *2 (E.D. Va. Aug. 18, 2021). The article generated approximately $2 to $3 in advertising revenue for IJR based on the number of page views it received.

In May 2020, Philpot sued IJR for copyright infringement.  IJR moved for summary judgment, raising the affirmative defense of fair use under the Copyright Act pursuant to 17 U.S.C. § 107, and alternatively raising the defense that Philpot's registration was invalid. For his part, Philpot also moved for partial summary judgment, arguing in relevant part that his registration was valid and that IJR's use of the photo did not meet the requirements for the application of the fair-use affirmative defense. The district court determined there was a genuine dispute of material fact as to the validity of Philpot's copyright registration—precluding summary judgment for either party on that issue—but

4

it ultimately granted IJR's motion for summary judgment on fair-use grounds. It accordingly denied Philpot's motion for summary judgment. Philpot timely appealed.

## II.

We review the district court's grant or denial of summary judgment de novo. *Adnet, Inc. v. Soni*, 66 F.4th 510, 514 (4th Cir. 2023). "Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (citing Fed. R. Civ. P. 56(a)). Where the district court disposes of cross-motions for summary judgment, we consider each motion separately, resolving all factual disputes in the light most favorable to the party opposing that motion. *Adnet*, 66 F.4th at 514; *accord Wingate v. Fulford*, 987 F.3d 299, 304 (4th Cir. 2021) (same).

## III.

We begin with the district court's determination that IJR was entitled to summary judgment based on fair use. As Philpot is the nonmoving party on this issue, we "view the facts and draw all reasonable inferences therefrom" in the light most favorable to him. *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 150 (4th Cir. 2012) (cleaned up).

Section 106 of the Copyright Act grants "a bundle of exclusive rights to the owner of the copyright," including the rights "to publish, copy, and distribute the author's work." *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 546–47 (1985). "These rights, however, are 'subject to a list of statutory exceptions, including the exception for fair use provided in 17 U.S.C. § 107.'" *Bouchat v. Balt. Ravens Ltd. P'ship* (*Bouchat IV*), 619 F.3d 301, 307 (4th Cir. 2010) (cleaned up). Fair use is a "complete defense" to copyright

infringement. *Id.* That is to say, "the fair use of a copyrighted work . . . is not an infringement of copyright." *Id.* (quoting 17 U.S.C. § 107).

To determine whether a secondary use of a copyrighted work constitutes fair use, courts consider four statutory factors: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Campbell v. Acuff-Rose Music Inc.*, 510 U.S. 569, 577 (1994) (quoting 17 U.S.C. § 107). All four factors must be "explored, and the results weighed together, in light of the purposes of copyright." *Id.* at 578. Considering these factors in turn, we hold that IJR's use of Philpot's Photo did not constitute fair use.

### A.

The first fair use factor, the "purpose and character of the use," requires us to consider whether the secondary use of the Photo was (a) transformative and (b) of a commercial nature or for nonprofit educational purposes. *See Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–33 (2023). While the first fair use factor most clearly weighs in favor of fair use if the use was transformative and noncommercial, "the more transformative the new work, the less will be the significance of other factors, like commercialism." *Campbell*, 510 U.S. at 579. Because for the reasons stated below, we believe that IJR's use was non-transformative and commercial, we conclude that the first factor weighs strongly against fair use.

6

1.

We first consider whether IJR's use was transformative. A secondary use is transformative when it has a "further purpose or different character" than the original work. *Warhol*, 598 U.S. at 525, 528–29 (quoting *Campbell*, 510 U.S. at 579). The preamble to section 107 of the Copyright Act identifies criticism, comment, and news reporting as examples of transformative uses. *Campbell*, 510 U.S. at 576–78. Because "[m]any secondary works add something new," the determination of transformative use is a matter of *degree*. *Warhol*, 598 U.S. at 528–29. "The larger the difference, the more likely the first factor weighs in favor of fair use. The smaller the difference, the less likely." *Id.* at 529.

The Supreme Court's recent opinion in *Andy Warhol Foundation for the Visual Arts v. Goldsmith* provides helpful guidance. There, photographer Lynn Goldsmith took photos of the entertainer Prince, and subsequently licensed them to magazines to accompany stories about the musician. *Id.* at 516–17, 520. The prolific visual artist Andy Warhol created a derivative work of one of Goldsmith's photos, dubbed "Orange Prince." *Id.* at 518–19. The Andy Warhol Foundation then licensed Orange Prince to a magazine for the cover of its commemorative edition about Prince. *Id.* at 519–20. "When Goldsmith informed [the Foundation] that she believed its use of her photograph infringed her copyright, [the Foundation] sued her." *Id.* at 515.

The Supreme Court granted certiorari to consider the "narrow issue" of "whether the first fair use factor" weighed in favor of the Foundation. *Id.* at 516. It held that it did not. In so holding, the Court noted that "[a] typical use of a celebrity photograph is to accompany stories about the celebrity." *Id.* at 534. It then held that even if Orange Prince

7

added new expression to the original photo, the magazine's use was not transformative because the purpose of both works was to illustrate stories about Prince. *Id.* at 534–36, 540–41.

Like the magazine's use of Orange Prince in *Warhol*, IJR's use of the Photo was not transformative. Here, as in *Warhol*, Philpot took the Photo to capture a "portrait[]" of Nugent, and IJR used the Photo to "depict" the musician. *Id.* at 526. Accordingly, the two uses "share[d] substantially the same purpose." *Id.* Indeed, IJR has less of a case for "transformative" use than the Andy Warhol Foundation did in *Warhol*. Unlike the orange dubbing in that case, IJR did not alter or add new expression to the Nugent Photo beyond cropping the negative space:




Original photo                    IJR's use

*See also Brammer v. Violent Hues Prods., LLC*, 922 F.3d 255, 263 (4th Cir. 2019) (holding a use was not transformative where "[t]he only obvious change [the defendant] made to the Photo's content was to crop it so as to remove negative space," which "does not alter the

8

original with 'new expression, meaning or message.'" (quoting *Campbell*, 510 U.S. at 579)).

The district court found that IJR's use was transformative because it placed the Photo in a new context, a list of "Signs Your Daddy Was a Conservative." *Philpot*, 2021 WL 3669321, at *6. But that reasoning resembles the argument that this Court rejected in *Brammer v. Violent Hues Productions*. In that case, a film company used a photo of the Washington, D.C., neighborhood Adams Morgan in an online advertisement for a Virginia film and music festival. *Brammer*, 922 F.3d at 261. The photo was included alongside a list of D.C.-area tourist attractions with the caption "Adams Morgan, DC." *Id.* The photographer who shot the photo had originally created it for use as a commercial stock image with the caption "Adams Morgan at Night." *Id.* He sued the film company for copyright infringement, and the issue on appeal was whether the fair use defense applied. *Id.* at 260–61.

This Court held the fair use defense did not apply. *Id.* at 269. In assessing whether the film company's use was transformative, this Court held that even if a copyrighted work is placed in a "new context to serve a different purpose" than the original work—there, the different purpose of listing tourist attractions for an advertisement—in order to be transformative, "the secondary use still must generate a societal benefit by imbuing the original with new function or meaning." *Id.* at 263. Because the film company in *Brammer* "used the Photo expressly for its content—that is, to depict Adams Morgan"—its use did not imbue the photo with a new function or meaning and thus was not transformative. *Id.* at 264. Likewise here, Philpot took the Photo to identify Nugent. IJR used the Photo for

9

precisely the same reason: to depict "The Nuge." Accordingly, IJR's secondary use of the Photo did not add new meaning or function that would render its use transformative. Because IJR's use of the Photo did not add new purpose or meaning, and only minimal alteration, the use was not transformative. This weighs against a finding of fair use.

2.

Having concluded that IJR's use was non-transformative, we next consider whether the secondary use was of a commercial nature or for nonprofit educational purposes. 17 U.S.C. § 107(1). "The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." *Bouchat IV*, 619 F.3d at 311 (quoting *Harper & Row*, 471 U.S. at 562).

According to IJR's Financial Interest Disclosure Statement, it is a C corporation, and therefore a for-profit corporation. Financial Interest Disclosure Statement at 1, *Philpot*, No. 1:20-cv-00590-AJT-TCB (E.D. Va. Aug. 13, 2020), ECF No. 5. While IJR does not charge readers to view its articles, it obtains revenue from advertising, and it earned some advertising revenue—albeit only $2 to $3—based on the number of views of the article that used the Photo. Further, IJR's use of the Photo was exploitative: Philpot licensed the Photo, and IJR did not pay the customary price of direct attribution to Philpot.

To be sure, the article was not especially profitable for IJR. But the salient question is whether IJR stood to profit, not whether it was particularly successful at that venture. *See Brammer*, 922 F.3d at 265 ("[Defendant's] website did not generate direct revenue or run advertising. But [Defendant] is a limited liability company, and it used the Photo on its

10

website to promote a for-profit film festival. On their own, these facts tend to demonstrate commercial use."). Thus, IJR's use of the Photo was commercial.

Because IJR's use of the Photo was non-transformative and commercial, the first factor of the fair use analysis counsels strongly against fair use.

B.

The district court made no mention of the second and third factors of the fair use analysis, but both weigh against fair use.

The second fair use factor considers the "nature of the copyrighted work." 17 U.S.C. § 107(2). In assessing the copyrighted work's nature, we consider "the extent to which it is creative." *Monge v. Maya Mags., Inc.*, 688 F.3d 1164, 1177 (9th Cir. 2012); *accord A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 640 (4th Cir. 2009) (similar). "As a basic matter, photographs are 'generally viewed as creative, aesthetic expressions['] . . . and have long received thick copyright protection," even where they "capture images of reality" and regardless of their publication status. *Brammer*, 922 F.3d at 267 (quoting *Monge*, 688 F.3d at 1177). And here, Philpot made several creative choices in capturing the Photo, including "selecting the subject matter, angle of photography, exposure, composition, framing, location, and exact moment of creation." J.A. 575. Thus, the Photo merits "thick copyright protection," and the second factor weighs against fair use.

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). This factor weighs against fair use where "a significant percentage of the copyrighted work was copied," or

11

where "the copied portion essentially was the 'heart' of the copyrighted work." *Sundeman v. Seajay Soc'y, Inc.*, 142 F.3d 194, 205 (4th Cir. 1998) (quoting *Wright v. Warner Books, Inc.*, 953 F.2d 731, 738 (4th Cir. 1991)). Both are true here: IJR copied a significant percentage of the Photo in its article, and it only cropped out the negative space while keeping the Photo's expressive features, or the "heart" of the work. *Sundeman*, 142 F.3d at 205; *accord Brammer*, 922 F.3d at 268 (holding same where the defendant "merely removed the negative space [of the photo] and kept the most expressive features" (citing *Sundeman*, 142 F.3d at 205)). Thus, the second and third factors weigh against fair use.

## C.

The fourth and final factor also weighs against fair use. The fourth factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4). In analyzing this factor, we consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." *Campbell*, 510 U.S. at 590 (cleaned up); *accord Bouchat IV*, 619 F.3d at 312 ("[O]ne need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." (quoting *Harper & Row*, 471 U.S. at 568)).

IJR argues that because Philpot permits free use of the Photo, he failed to show any financial harm to the Photo's potential market. But that argument ignores the general rule that we presume a "cognizable market harm exists when a commercial use is not transformative but instead 'amounts to mere duplication of the entirety of an original.'"

12

*Brammer*, 922 F.3d at 268 (quoting *Campbell*, 510 U.S. at 591); *e.g.*, *Sony Corp. Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984) ("[E]very commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright[.]"); *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 308 (3d Cir. 2011) ("If it were possible to reproduce [a photographer's] unaltered work, as a whole, without compensation . . . it would surely have a 'substantially adverse impact' on his ability to license his photographs." (quoting *Campbell*, 510 U.S. at 590)). That presumption applies here: IJR made commercial use of the Photo and duplicated the "heart of the work," while only removing the negative space. *Brammer*, 922 F.3d at 268. As a result, "[Philpot] need not demonstrate that the licensing market for his photo would be depressed should [IJR's] behavior become widespread." *Id.*

Moreover, even though Philpot does not need to make this showing, he has done so here. The evidence viewed in the light most favorable to him reveals that if IJR's challenged use becomes uninterrupted and widespread, it would adversely affect the "*potential* market" for the Photo. *Harper & Row*, 471 U.S. at 568 (quoting *Sony*, 464 U.S. at 451). Philpot is a freelance professional photographer who specializes in capturing musicians in concert. His market is thus the universe of music and celebrity audiences. And IJR's use was the paradigmatic example of Philpot's reasonable market: licensing to media outlets. If IJR's behavior in copying Philpot's photography to depict musicians for a commercial purpose without payment or attribution became widespread, Philpot's potential market would likely decrease. *See Brammer*, 922 F.3d 255 at 268–69.

13

Certainly, Philpot offers the use of some photos in exchange for nothing more than proper attribution. But "[t]he copyright law does not require a copyright owner to charge a fee for the use of his works[;] . . . the owner of a copyright may well have economic or noneconomic reasons for permitting certain kinds of copying to occur without receiving direct compensation from the copier." *Sony*, 464 U.S. at 447 n.28. Moreover, Philpot has introduced evidence that his standard licensing fee is $3,500, and that AXS TV paid Philpot $4,500 to license his photos, including the Nugent Photo. Philpot, then, relies on attributions or payments from users of his images to sustain himself in the world of concert photography. This factor, like the preceding factors, thus weighs against fair use.

In sum, all four factors weigh against a finding of fair use. Therefore, we hold that IJR's use of the Photo was not fair use and the district court erred in granting summary judgment to IJR on that basis and in denying Philpot's motion for summary judgment on IJR's fair use defense.[4]

## IV.

Philpot also appeals the district court's decision to deny his motion for summary judgment on IJR's alternative defense that Philpot's copyright registration for the Photo was invalid because it was registered as *unpublished* despite being *published*. The district

---

[4] Because we hold that IJR's use did not constitute fair use, that necessarily results in a grant of Philpot's motion for summary judgment on IJR's defense of fair use. Though we typically "consider each [summary judgment] motion separately, resolving all factual disputes in the light most favorable to the party opposing that motion," *Adnet*, 66 F.4th at 514 (citation omitted), the parties did not dispute the facts necessary to our finding that IJR's use was not fair use, and the same legal analysis applies to both motions.

court declined to grant summary judgment to both parties, finding that there was a material dispute of fact as to the registration validity. We disagree and conclude that Philpot is entitled to summary judgment on this defense.

As before, our review is de novo. We consider both motions, viewing the facts and inferences drawn from them in the light most favorable to the nonmoving party, this time IJR. *Adnet*, 66 F.4th at 514.

A valid copyright registration is required to bring a copyright infringement claim. *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, 595 U.S. 178, 181 (2022) (citing 17 U.S.C. § 411(a)). If a copyright registration contains inaccurate information, it is nonetheless still valid unless (1) the applicant included the inaccurate information on the registration application with knowledge that it was inaccurate; and (2) the inaccuracy, if known to the Register of Copyrights, would have caused the Register to refuse registration. *Id.* at 181–82 (citing 17 U.S.C. § 411(b)(1)). Philpot's copyright registration certificate is prima facie evidence that the copyright is valid, 17 U.S.C. § 410(c), and IJR bears the burden of overcoming that presumption. *M. Kramer Mfg. Co. v. Andrews*, 783 F.2d 421, 434 (4th Cir. 1986).

IJR argues that the Photo's copyright registration is invalid because it contains inaccurate information. Specifically, IJR contends that Philpot knowingly filed the Photo for registration in a group of *unpublished* works on August 15, 2013, even though it was *published* on August 8, 2013, pursuant to the AXS TV Agreement. *See* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 612.3 (3d ed. 2021) [hereinafter Compendium] (specifying that the determination of whether a work is published "should

15

be based on the facts that exist at the time the application is filed").[5] Because published

and unpublished works cannot be registered together, IJR contends that this error

invalidated the registration. *See* 37 C.F.R. § 202.3(b)(5)(i–ii) (2022); *United Fabrics Int'l,*

*Inc. v. C&J Wear, Inc.*, 630 F.3d 1255, 1259 (9th Cir. 2011) ("When one registers a

collection of works in a single copyright, it can be registered either as a 'published' or an

'unpublished' collection." (citing 37 C.F.R. § 202.3(b)(4))); *Gold Value Int'l Textile, Inc.*

*v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1145–46 (9th Cir. 2019) (characterizing

inclusion of published works in unpublished collection as "inaccuracy"), *abrogated on*

*other grounds by Unicolors*, 595 U.S. at 178. The issue, then, is whether Philpot published

the Photo before he filed it as an unpublished work with the Copyright Office on August

15. Philpot argues that merely entering the Agreement on August 8 did not constitute him

publishing the Photo, so his copyright registration was accurate and therefore valid. We

agree with Philpot.

A work is "published" under the Copyright Act through "the distribution of copies

or phonorecords of a work to the public by sale or other transfer of ownership, or by rental,

lease, or lending." 17 U.S.C. § 101. "The offering to distribute copies or phonorecords to

a group of persons for purposes of further distribution . . . or public display, constitutes

publication." *Id.* As several other circuits have held, however, an author does not publish

---

[5] "[T]he Compendium is a non-binding administrative manual," and therefore "we must follow it only to the extent it has the 'power to persuade.'" *Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). We find it persuasive in this instance.

their work for purposes of § 101 merely by distributing it to a "definitely selected class of persons" for a "limited purpose," without the right of further distribution. *Warner Bros. Ent. v. X One X Prods.*, 644 F.3d 584, 593 (8th Cir. 2011) (collecting cases); *accord Soc'y of Holy Transfig. Monastery, Inc. v. Gregory*, 689 F.3d 29, 45 (1st Cir. 2012) (applying the same test); Compendium § 1905.1 (noting that "publication occurs when one or more copies or phonorecords are distributed to a member of the public who is not subject to any express or implied restrictions concerning the disclosure of the content of that work"; for example, "[g]iving away copies of a photograph without further restriction constitutes publication of that work," but "[s]ending copies of a manuscript to prospective publishers in an effort to secure a book contract does not"); *cf. Avtec Sys., Inc. v. Peiffer*, 21 F.3d 568, 572 n.8 (4th Cir. 1994) (noting that "it is generally agreed that publication does not include the distribution of copies under an obligation of confidence" (cleaned up)).

Rather, the "distribution" described in § 101 must be to "the public at large without regard to who they are or what they propose to do with [the work]." *Gregory*, 689 F.3d at 45 (quotation marks and citation omitted); *see also Milton H. Greene Archives, Inc. v. BPI Commc'ns, Inc.*, 320 F. App'x 572, 573 (9th Cir. 2009) (general publication occurs when photographs are distributed with "the right of diffusion, reproduction, or distribution." (cleaned up)). In other words, the work must be made publicly available such that it "may be deemed 'dedicated to the public and rendered common property.'" *Gregory*, 689 F.3d at 45 (quoting *Burke v. Nat'l Broad. Co.*, 598 F.2d 688, 691 (1st Cir. 1979)); *see also Milton*, 320 F. App'x at 573 (explaining work must enter "the public domain").

17

The district court found that a genuine factual dispute precluded summary judgment for either party on the validity of the copyright. It reasoned that while it was undisputed that the Agreement was entered on August 8, 2013, there was evidence showing that Philpot did not deliver the Nugent Photo to AXS TV through email until September 10, 2013, which indicated that the Photo was not *published* until that later date. In other words, IJR and Philpot dispute whether publication occurred when Philpot entered the Agreement on August 8 (before the Photo was registered with the Copyright Office as an unpublished work) or when Philpot delivered the Photo to AXS TV on September 10 (after the Photo was registered).

But this dispute is one of law, not of fact. The relevant question is whether the Agreement constituted an "offer" of distribution so as to constitute publication under the Copyright Act. To answer that question, we must first determine whether the Agreement's choice-of-law provision dictating that it is to be governed by California law is enforceable. In that inquiry, we apply the choice-of-law rules of the state in which the district court sits, in this case Virginia. *See Mamadou v. Cho*, No. 20-cv-146, 2020 WL 13750518, at *9 (E.D. Va. Nov. 6, 2020) ("In a federal question case that incorporates a state law issue, such as contract formation . . . a district court applies the choice-of-law rules of the state in which it sits unless a compelling federal interest directs otherwise."); *Iannello v. Busch Ent. Corp.*, 300 F. Supp. 2d 400, 402 (E.D. Va. 2004) ("Generally, a district court applies the conflicts of law provisions of the state in which it sits."); *c.f. W.C. & A.N. Miller Dev. Co. v. Cont'l Cas. Co.*, 814 F.3d 171, 176 (4th Cir. 2016) ("The district court sat in

18

Maryland and, therefore, Maryland choice of law rules apply." (citing *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999) (diversity jurisdiction))).

Under Virginia law, courts enforce the choice-of-law rules that the parties expressly contracted into. *Hengle v. Treppa*, 19 F.4th 324, 349 (4th Cir. 2021) ("Under Virginia law, parties to a contract are free to specify the law that governs their agreement. Virginia courts accordingly give [such clauses] 'full effect except in unusual circumstances.'" (citation omitted) (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 624 (4th Cir. 1999))), *cert. dismissed sub nom. Asner v. Hengle*, 142 S. Ct. 2093 (2022); *accord United States ex. Rel. McKenney's, Inc. v. Leebcor Servs., LLC*, 622 F. Supp. 3d 165, 174 (E.D. Va. 2022) ("Where parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, Virginia courts will recognize such agreement and enforce it, applying the law of the stipulated jurisdiction." (cleaned up)). Moreover, neither party contests the application of California law. Therefore, we will enforce the Agreement's choice-of-law clause and apply California law.

California law instructs that we interpret the license using normal contract principles, effectuating the mutual intention of the parties as it existed at the time of contracting. *See AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1264 (Cal. 1990) (citing Cal. Civ. Code § 1636). If possible, such intent is ascertained from the plain language of the contract alone. *Id.*

The Agreement's plain language establishes that it did not constitute publication of the Photo. As explained, a work is "published" for purposes of the Copyright Act when an

19

individual "offer[s] to distribute copies or phonorecords [of the work] to a group of persons for purposes of further distribution . . . or public display." 17 U.S.C. § 101. But here, the Agreement contains no offer to *distribute* or *publicly display* copies of the Photo to AXS TV.

The Agreement provided that Philpot would make at least 1,000 photos from his Library available to AXS TV, from which AXS TV could select twelve "to curate . . . for licensing" S.J.A. 284. "Upon delivery" of the 1,000 photos, Philpot would grant AXS TV a license *only* for the purpose of "review[ing] and examin[ing]" the photos. *Id.* If AXS TV could not find twelve photos of its liking, then it could "make further specific requests" for photos of "specific musical celebrities" from Philpot's "remaining library," which included "an estimated 45,000 photographs" as of the date of the Agreement. S.J.A. 285. Upon that request, if Philpot had photos available, the Agreement mandated that he would "*select*" and send AXS TV "*a reasonable number*" of the photos, subject to the same requirement that AXS TV would be granted a license only to "review and examine" the extra photos to select twelve for curation. S.J.A. 284–85 (emphases added).

Further, once AXS TV selected the twelve photos for curation, the Agreement required it to "inform[]" Philpot of its selections and of its "proposed and intended uses" for the photos. S.J.A. 285. Then, Philpot would send higher resolution versions of the twelve photos that were sufficient for AXS TV's intended use. *Id. Finally*, upon delivery of the twelve higher-resolution photos to AXS TV, Philpot would grant AXS TV a "worldwide, nonexclusive" license to "use, reproduce, modify, display, perform, embed, create derivative works based upon, and distribute" the twelve photos. S.J.A. 286.

20

This plain language makes clear that by entering into the Agreement, Philpot neither intended to distribute the Photo nor offered to do so. 17 U.S.C. § 101. To the contrary, the Agreement's terms plainly demonstrate that Philpot only intended to send 1,000 of his 45,000 photos to AXS TV, and that several more steps were required before twelve of those photos ultimately entered the "public domain." *Milton*, 320 F. App'x at 573. The Agreement only granted AXS TV the limited license to internally "review and examine" the 1,000 photos to select twelve "*for further licensing*" to *then* distribute those photos publicly. S.J.A. 284 (emphasis added). The Agreement expressly qualified that AXS TV had no right to "publicly release, display, or perform" the photos until it selected twelve and obtained a second license that did allow for distribution of the selected photos. S.J.A. 284–85; *cf.* 17 U.S.C. § 101 (distribution occurs with offer of further "distribution" or "display"). And before AXS TV could receive the second license for public distribution of the twelve photos, it had to provide notice to Philpot and obtain his consent. It is hard to imagine clearer terms reflecting Philpot's intention that his photo library not become "common property" through the Agreement. *Gregory*, 689 F.3d at 45 (quoting *Burke*, 598 F.2d at 691).

This is instead a classic case where Philpot offered to share his work with AXS TV, a "definitely selected" group, for the "limited purpose" of its examination and review, without any right to further distribution. *Warner Bros.*, 644 F.3d at 593; *cf. Milton*, 320 F. App'x at 573 (finding publication when author distributed photos along with the right of reproduction and distribution); *Gregory*, 689 F.3d at 45 (stating a publication occurs when work is available to the public regardless of "who they are or what they propose to do with

21

it" (quoting *Burke,* 598 F.2d at 691)). Practically speaking, Philpot offered to distribute 1,000 photos to AXS TV pursuant to the Agreement as a necessary initial step in effectuating a much smaller publication later. Implicit in this business relationship, and explicit in the Agreement's terms, is the understanding that the Agreement on August 8 did not convey the right further to distribute or sell the photographs without Philpot's permission. To conclude otherwise would yield an unreasonable result: the Agreement would constitute a publication and relinquishment of Philpot's rights in 1,000 photos at best, and every photo in his library, at worst. But the text of the Agreement does not support such. The Agreement's effect is plain: Philpot's photos did not pass into the public domain.

Therefore, the Agreement did not constitute publication of the Photo. IJR does not point to any other basis on which we could conclude that Philpot published the Photo before August 15, 2023. Thus, IJR has not pointed to any inaccuracy in Philpot's copyright registration, and Philpot is entitled to summary judgment on IJR's defense of copyright invalidity.[6]

## V.

Because IJR's use of the Photo was not fair use and Philpot's copyright registration was valid as a matter of law, we reverse the district court's grant of summary judgment to

---

[6] In his motion for Partial Summary Judgment, Philpot also moved for summary judgment on the seventeen other affirmative defenses that IJR raised in its Answer. The district court did not consider those defenses because it determined that IJR was entitled to judgment based on its fair use finding. We leave it to the district court to consider any preserved defenses in the first instance on remand.

23

IJR—and its denial of summary judgment to Philpot—on those issues. We remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*